UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:14cv167-FDW

| JEREMY DANIEL RUSSOM, | ) | |
|---|---|---|
| Petitioner, | ) | |
| vs. | ) | **ORDER** |
| KEITH WHITENER, | ) | |
| Respondent. | ) | |

**THIS MATTER** is before the Court upon Jeremy Daniel Russom's pro se Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Also before the Court are Respondent's Motion for Summary Judgment (Doc. No. 6) and Petitioner's motions for evidentiary hearing and appointment of counsel (Doc. No. 3).

**I. BACKGROUND**

Petitioner is a prisoner of the State of North Carolina, who, on October 8, 2012, in Watauga County Superior Court pled guilty to two counts of first degree murder. (J. and Commitment, Resp't's Ex. 1, Doc. No. 7-2.) Pursuant to Petitioner's plea arrangement with the State, the trial court consolidated the two offenses for judgment and sentenced Petitioner to life imprisonment without the possibility of parole. (J. and Commitment, supra.) Because Petitioner initially was charged with first-degree capital murder, he was appointed two attorneys, Mr. Garland Baker and Mr. Don Willey, who represented him until the court entered judgment in the

1

cases. (Plea Hr'g Tr. 9, Resp't's Ex. 2, Doc. No. 7-3.)[1] The factual basis for the plea was summarized by a detective involved in the case:

> [O]n November 22, [2010], our office received a phone call in reference to a person in the road on Mabel School Road and [sic] was bleeding. We had officers who responded. We found Barry Cook laying beside of the road with two apparent gunshot wounds to his chest area. Immediately begin to administer medical treatment to him. Later, just a few seconds later, we did an emergency sweep of the house located there on Mabel School Road where we located Heather Baumgardner, with two gunshot wounds, in the laundry area of that house.
>
> We later found out that there was a witness to the incident, a six-year-old juvenile, who was taken the following morning to Marion, and received a child advocacy interview, and he gave us information saying that the defendant, Jeremy Russom, had shot Barry and had shot his mother, Heather. He also gave us information saying that the defendant had broken into the house and was waiting on them as they arrived at home on that date.

(Plea Hr'g Tr., supra, at 9-10.) The six year-old was the biological child of Baumgardner and Petitioner. (Plea Hr'g Tr., supra, at 10.) At the time of the murders, Baumgardner and Cook were dating each other. (Plea Hr'g Tr., supra.) Autopsies and lab tests revealed that both victims were shot with .38 caliber rounds. (Plea Hr'g Tr., supra, at 12.) Law enforcement retrieved a .38 caliber handgun from a neighboring yard where witnesses reported seeing Petitioner put it. (Plea Hr'g Tr., supra, at 12-13.)

Petitioner did not file a direct appeal, but on August 22, 2013, he filed a pro se Motion for Appropriate Relief ("MAR") in Watauga County Superior Court. (Pet'r's Ex. D 2-15, Doc. No. 1-4.) On October 15, 2013, the state court appointed North Carolina Prisoner Legal Services, Inc. ("NCPLS") to represent Petitioner in his MAR proceedings. (Resp't's Ex. 8, Doc. No. 7-9.) On January 14, 2014, the State filed an answer and brief in response to Petitioner's MAR and a motion for summary judgment. (Resp't's Ex. 10, Doc. No. 7-11.) On January 27,

---

[1] With the exception of citations to court transcripts, page numbers in citations to documents filed in this case are those generated by the district court's electronic filing system. Page numbers in citations to transcripts are those generated by the court reporter.

2014, Ms. Lindsay Bass, the Staff Attorney at NCPLS who was appointed to represent Petitioner, filed notice that she did not intend to amend the MAR. (Resp't's Ex. 13, Doc. No. 7-14.) On June 25, 2014, the state court summarily denied Petitioner's MAR, concluding that "no sufficient legal or evidentiary grounds exist for . . . granting" the MAR. (Resp't's Ex. 17, Doc. No. 7-18.)

On August 18, 2014, Petitioner filed a pro se certiorari petition in the North Carolina Court of Appeals seeking review of the state court's order. (Resp't's Ex.18, Doc. No. 7-19.) On September 5, 2014, the court dismissed the petition. (Order 1, Pet'r's Ex. D, Doc. No. 1-4.)

Petitioner did not date the instant pro se habeas petition, but it was filed in federal district court on October 9, 2014. (Pet. 15, Doc. No. 1.) Shortly thereafter he filed a motion for evidentiary hearing and appointment of counsel. (Doc. No. 3.) After conducting an initial review required by Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts, this Court ordered Respondent to file a response to the Petition. Respondent filed a Response (Doc. No. 5) and a Motion for Summary Judgment (Doc. No. 6) with supporting memorandum and exhibits (Doc. No. 7.) Petitioner filed a Reply. (Doc. No. 9.)

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986). Where, however, the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).

**B. The Antiterrorism and Effective Death Penalty Act of 1996**

Review of Petitioner's claims that were adjudicated on their merits by the state courts is limited by the deferential standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), as construed by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 374-91 (2000). This Court may grant habeas relief on claims of constitutional error adjudicated on their merits in state court only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]." Williams, 529 U.S. at 405. A state court unreasonably applies federal law when it "identifies the correct governing legal rule from th[e Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case." Id. at 407. A state court's determination that a claim fails on its merits cannot be overturned by a federal habeas court "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Finally, where, as here, the state court has issued a summary denial of a prisoner's federal claims, it is presumed to be an adjudication on the merits for § 2254(d)(1) purposes. See Richter,

562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir. 2000) (en banc) (reaffirming that a summary state court decision on the merits of a federal constitutional claim is an "adjudication" of the claim for purposes of § 2254(d)). Additionally, when the state court does not provide reasons for its dismissal of a petitioner's claim, the federal habeas court considers "'what arguments or theories . . . could have supported[ ] the state court's decision.'" Lynch v. Dolce, 789 F.3d 303, 311 (2d Cir. 2015) (quoting Richter, 562 U.S. at 102) (alteration in the original).

## III  DISCUSSION

### A. Motions for Evidentiary Hearing & Appointment of Counsel

In Cullen v. Pinholster, the Supreme Court held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." 131 S.Ct. 1388, 1400 (2011). In other words, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Id. at 1398. Therefore, district courts may not conduct evidentiary hearings "to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue." Ballinger v. Prelesnik, 709 F.3d 558, 561 (6th Cir.) cert. denied, 133 S.Ct. 2866 (2013) (citing Pinholster, 131 S.Ct. at 1400).

As explained in the previous section of this Order, the Watauga County Superior Court adjudicated the claims raised herein on the merits. See Section II B, supra, at 4-5. Thus, this Court may not hold an evidentiary hearing on Petitioner's claims. See Ballinger, 709 F.3d at 561. His motion for evidentiary hearing, therefore, is denied.

5

As for Petitioner's other motion, there is no constitutional right to the appointment of counsel in a § 2254 proceeding. Crowe v. United States, 175 F.2d 799 (4th Cir. 1949). Instead, appointment of counsel is governed by Rules 6(a) and 8(c) of the Rules Governing Section 2254 Cases in the United States District Courts, which mandate the appointment of counsel where discovery is necessary or if the matter proceeds to an evidentiary hearing. Neither of those situations apply here.

Additionally, the Court has the discretion to appoint counsel to financially eligible persons in a § 2254 action upon finding that "the interests of justice so require." 18 U.S.C. § 3006A(a)(2)(B). After a review of the record, the Court concludes that Petitioner has not shown circumstances demonstrating the need for appointment of counsel in this case. Accordingly, Petitioner's motion for appointment of counsel is denied.

### B. Pediatric Medical Records

Respondent asserts that pediatric medical records submitted as an exhibit to the instant Petition (Pet'r's Ex. B 1-42, Doc. No. 1-2) were not attached as an exhibit to Petitioner's MAR. (Mem. in Support of Summary J. Mot. 7-8, Doc. No. 7.) The Court notes that the MAR refers to the pediatric records and states that they are attached in an appendix. (MAR 11-12, Pet'r's Ex. D, Doc. No. 1-4.) Petitioner did not attach the MAR appendix as an exhibit to his habeas petition, however.

Respondent, on the other hand, provided copies of missing pages from Petitioner's MAR, as well as copies of medical records attached to the MAR. (Resp't's Exs. 4, 5, & 6, Doc. Nos. 7-5, 7-6, & 7-7.) None of those exhibits contain the pediatric records. Moreover, in his Reply, Petitioner does not refute Respondent's contention that the pediatric records were not part of the state court record. (Doc. No. 9.)

Based upon the record before it, this Court finds that the pediatric records attached to the instant habeas petition as Petitioner's Exhibit B (Doc. No. 1-2) were not part of the record when the state court considered Petitioner's claims on the merits. Likewise, the Court can find no evidence that Petitioner's pediatric medical records from 1994, filed in this Court on November 6, 2014 (Doc. No. 2), were part of the record when the state court considered Petitioner's claims on the merits. Therefore, this Court is precluded from considering any of Petitioner's pediatric medical records on federal habeas review. See Pinholster, 131 S. Ct. at 1398.

### C. Involuntary Guilty Plea: Competency

Petitioner claims that his guilty plea was not knowing, intelligent, or voluntary because he was being treated for various mental problems and under the influence of medication to treat his mental illness when he entered his guilty plea. Petitioner raised this claim in his MAR, and it was denied on the merits.

The Constitution requires that a defendant entering a guilty plea must do so knowingly, voluntarily, and intelligently. Brady v. United States, 397 U.S. 742, 748 (1970). A defendant enters a guilty plea intelligently when he is "advised by competent counsel, . . . made aware of the nature of the charge against him, and there was nothing to indicate that he was incompetent or otherwise not in control of his mental faculties." Id. at 756. A guilty plea is voluntary if "entered by one fully aware of the direct consequences" of the plea. Id. at 755 (citation and quotation omitted). The appropriate test for a defendant's competency to stand trial in North Carolina is "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." State v.Badgett, 644 S.E.2d 206, 221 (N.C. 2007) (quotation marks and citations omitted).

On October 8, 2012, Petitioner appeared in Watauga County Superior Court and entered guilty pleas to two counts of first-degree murder pursuant to a plea deal with the State. The trial judge held a lengthy plea colloquy with Petitioner. (Plea Hr'g Tr. 2-8, Resp't's Ex. 2, Doc. No. 3.) The following portions of that colloquy are relevant to Petitioner's assertion that he was not competent to plead guilty:

> THE COURT: At what grade level can you read and write?
>
> DEFENDANT: Sophomore in high school.
>
> THE COURT: Tenth grade?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Are you now under the influence of alcohol, drugs, narcotics, medicines, pills, or any other such substances?
>
> DEFENDANT: Yes, sir. I took blood-pressure medicine this morning.
>
> THE COURT: All right, sir. I'm going to strike through no and put yes, and at the appropriate time you and your attorneys will initial that. Is that the only medication you took?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Did you take that in its prescribed dosage?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Does that medication affect your ability to understand or comprehend what you're doing?
>
> DEFENDANT: No, sir.
>
> THE COURT: Are you here with a clear mind?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Fully understanding what you're doing here today?
>
> DEFENDANT: Yes, sir.

(Plea Hr'g Tr., supra, at 3-4.)

> THE COURT: Other than the plea arrangement between you and the prosecutor, has anyone promised you anything, or threatened you in any way, to cause you to enter this plea against your wishes?
>
> DEFENDANT: No, sir.
>
> THE COURT: Do you enter this plea of your own free will, fully understanding what you are doing?
>
> DEFENDANT: Yes, sir.

(Plea Hr'g Tr., supra, at 7.)

> The "Transcript of Plea" in this case includes the following questions:
>
> 4. (a). Are you now under the influence of alcohol, drugs, narcotics, medicines, pills, or any other substances?
> (b). When was the last time you used or consumed any such substance?

In answer to question 4(a), the trial judge hand-wrote "yes" and "blood pressures" [sic]. A hand-written "10/8/12" is in the answer column for question 4(b). Petitioner wrote his initials next to these answers, and signed the plea transcript. (Tr. of Plea, Resp't's Ex. 3, Doc. No. 7-4.)

The trial judge found as a matter of fact that Petitioner was competent when he entered his plea. (Plea Hr'g Tr., supra, at 13.) Findings of fact made by the state court are presumed to be correct absent clear and convincing evidence to the contrary. See 28 U.S.C. § 2254(e)(1).

Petitioner asserts that he informed counsel prior to the plea that he had taken 150 mg of Amitriptyline, which Petitioner refers to as a "psychotropic" drug, and that counsel Baker advised him not to tell the trial judge because the judge might then reject the plea. (MAR 5-6, Pet'r's Ex. D, Doc. No. 1-4.) In an affidavit filed with the State's response to Petitioner's MAR, Baker flatly denies any such conversation with Petitioner, stating:

> On Monday, 8 October 2012, I met with the Defendant in the holding cell at the Watauga County Courthouse sometime between 1:30 PM and 2:00 PM. I reviewed the questions on the Plea Transcript with the Defendant. In response to Question

9

> #4(a), the Defendant stated that he was not under the influence of alcohol, drugs, narcotics, medicines, pills or any other substances. In response to Question #4(b), the Defendant stated that he had last taken blood pressure medication earlier on 8 October 2012. The Defendant specifically stated that his blood pressure medication did not impair his mental faculties in any way. Accordingly, I wrote in "10/8/12" on the Plea Transcript with an ink pen to indicate the last date the Defendant had consumed any of the listed substances. The Defendant did not report any usage of Amitriptyline or any other drugs, "psychotropic" or otherwise.

(Baker Aff. 3 ¶7, Resp't's Ex. 11, Doc. No. 7-12.) Baker stated further that based upon his meeting with Petitioner in the holding cell, he formed the opinion that Petitioner was not impaired in any way. (Baker Aff., supra, at 4 ¶8.) Attached to Baker's affidavit is a copy of a page from the Watauga County Jail Medication Administration Record, which, according to Baker, shows that Petitioner "was last given an appropriate dosage of Amitriptyline on Sunday, 7 October 2012 at 7:00 p.m." (Baker Aff., supra, at 4 ¶10, 5.) The hearing in which Petitioner entered his plea was conducted the following day at 2:00 PM. (Baker Aff., supra, at 4 ¶9.)

Co-counsel Wiley likewise disputed Petitioner's assertion that he was impaired during the plea hearing. (Wiley Aff., 2 ¶7, Resp't's Ex. 12, Doc. No. 7-13.) In his affidavit filed with the State's response to Petitioner's MAR, Wiley stated that during their interactions over the five days leading up to and including October 8, 2012, Petitioner "appeared . . . to be competent and coherent and did not appear . . . to be under the influence of an impairing substance." (Wiley Aff., supra.) Wiley stated further that he "had no concerns or reservations regarding [Petitioner's] mental capacity to enter into the plea on October 8, 2012." (Wiley Aff., supra.)

Petitioner has not pointed to any evidence in the record that Amitriptyline is an impairing substance.[2] Even if it were an impairing substance, Petitioner provides no evidence that he

---

[2] According to the National Institutes of Health, Amitriptyline is prescribed to treat symptoms of depression, eating disorders, post-herpetic neuralgia (the burning, stabbing pains, or aches .after a shingles infection), and to prevent migraine headaches. U.S. National Library of Medicine, https://www.nlm.nih.gov/medlineplus/druginfo/meds (last visited Aug. 27, 2015).

10

would have remained impaired 19 hours after ingesting the drug. Moreover, based upon Petitioner's answers in the Transcript of Plea and during the plea hearing, it would have been reasonable for the state court to credit the attorneys' version of events over Petitioner's. See e.g., Little v. Allsbrook, 731 F.2d 238, 239 n.2 (4th Cir. 1984) ("In the absence of clear and convincing evidence to the contrary, [a petitioner] must be bound by what he said at the time of the plea.").

Likewise, the state court reasonably could have concluded that Petitioner's medical records did not support his claim that he was not competent to enter a knowing, intelligent, and voluntary guilty plea. Petitioner's medical records from December, 2007, show that he was assessed subsequent to assaulting his girlfriend, Heather. (2007 Assessment 3, Resp't's Ex. 5, Doc. No. 7-6.) He was diagnosed with "Intermittent Explosive Disorder," and the assessor recommended that Petitioner develop de-escalation and coping skills to manage his aggression and that he attend a weekly anger management batterer's group. (2007 Assessment, supra, at 8-9.) Petitioner was assessed again December 29-30, 2010, a month after the two murders at issue here. (2010 Assessment, Resp't's Ex. 6, Doc. No. 7-7.) The assessor, James Thorton, summarized Petitioner's reasons for seeking mental health treatment:

> [Petitioner] is having difficulty managing himself emotionally and behaviorally. He made preparations to hang himself after he was jailed in late November. He is on 15 minute watch. He reports hearing command voices urging him to kill himself. The voices seem to occur more frequently when he ruminates over his children. He reports he hears two voices, a man and a woman's voice, on either side of his head. He has no history of psychosis, so it is likely his symptoms result from stress and sleep deprivation (He sleeps little in jail).
> He reports frequent binges on methamphetamine for 4 years up to his arrest on 11/29/10. Symptoms of methamphetamine psychosis by his account were not severe, primarily stereotyped behaviors and some paranoia to the extent of watching out of windows, which usually came on near the end of a 5 day binge. He does not appear to be bringing any delusions from the meth psychosis into his current mental state—none of the delusions of parasitosis, paranoia, other delusions typical of stimulant psychosis.

> Jeremy can barely read—he struggles with children's books—so he has limited ability to entertain and distract himself in jai [sic].
> He complains of a shoulder injury he says was inflicted on him by the police, so he is unable to exercise.
> At the time of this interview, he rated his suicidal urges as a 1 on a scale of 10, but admitted his suicidal feeling increase when he ruminates about his children, so it likely fluctuates during a 24 hour period[.]

(2010 Assessment, supra, at 2.) Thorton recommended that jailers continue the 15 minute suicide watch. (2010 Assessment, supra.) Thorton diagnosed Petitioner with major depression and acute stress disorder. (2010 Assessment, supra, at 6.)

Petitioner's records show that Thorton treated Petitioner until May 17, 2011. (New River Progress Notes 1-16, Pet'r's' Ex. A, Doc. No. 1-2.) Thorton's notes do not report any "suicidal ideation" after February 15, 2011, and there is no report of Petitioner hearing voices after January 4, 2011. A review of the notes indicates that Petitioner's depressive moods were closely associated with court or custody actions and that he was in frequent conflict with jail staff. There is nothing in the notes stating or implying that Petitioner was exhibiting signs of psychosis or behavior that would affect his competency to stand trial by the time treatment apparently ended on May 17, 2011. In fact, the notes refer to Petitioner being depressed about a pending capital case hearing on February 21, 2011 but make no mention of symptoms or behavior that would lead a reasonable court to question Petitioner's competency to proceed at trial. (New River Progress Notes, supra, at 9.) On March 15, 2011, Thorton refers to Petitioner being depressed about a child custody hearing that occurred the previous day, again with no mention of abnormal symptoms or behavior. (New River Progress Notes, supra, at 7.)

In short, there is nothing in the record after February 15, 2011 that would cause a reasonable court to question Petitioner's competency to proceed to trial twenty (20) months later.

Thus, there is no clear and convincing evidence in the record that the trial court erroneously found that Petitioner was competent to enter a plea on October 8, 2012. See § 2254(e)(1).

Based upon the record before it, the state court considering Petitioner's MAR reasonably could have concluded that Petitioner was competent to stand trial and that his guilty plea was made knowingly, intelligently, and voluntarily. Consequently, the state court's rejection of this claim involved neither an unreasonable application of clearly established federal law nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See §§ 2254(d)(1)-(2).

**D. Involuntary Guilty Plea: Ineffective Assistance of Counsel**

Petitioner claims that counsel were ineffective for failing to request that the trial court order a psychiatric evaluation for Petitioner prior to his Rule 24 hearing. (MAR 4-5, Pet'r's Ex. D, Doc. No. 1-4.) Petitioner also claims that counsel were ineffective for allowing him to plead guilty to two first-degree murder charges when they knew he was under the influence of an impairing substance and being treated for various mental disorders. (MAR, supra, at 5-6.)

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." Kimmelman v. Morrison, 477 U.S. 365, 3745 (1986). In Strickland v. Washington, the Supreme Court identified two necessary components of an ineffective assistance claim. 466 U.S. 668, 687 (1984). First, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, "the defendant must show that the deficient performance prejudiced

13

the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

When assessing counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689. To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. It is not enough to show "that the errors had some conceivable effect on the outcome of the proceeding," id. at 693, or that "it is possible a reasonable doubt might have been established if counsel acted differently," Richter, 562 U.S at 111 Instead, "Strickland asks whether it is 'reasonably likely' the result would have been different," and the "likelihood of a different result must be substantial, not just conceivable." Id. at 111–12.

The Supreme Court has held that claims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in Strickland. See Hill v. Lockhart, 474 U.S. 52, 57 (1985). Where a defendant enters a guilty plea upon the advice of counsel, "the voluntariness of the plea depends on whether counsel's advice "was within the range of competence demanded of attorneys in criminal cases." Id. at 56 (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)) (quotation marks omitted). To demonstrate prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 58.

Petitioner first claims that counsel were ineffective for failing to request that the trial court order a psychiatric evaluation for Petitioner prior to his Rule 24 hearing. (MAR 4-5, Pet'r's Ex. D, Doc. No. 1-4.) Petitioner contends that a psychiatric exam would have shown that he was mentally ill and, therefore, ineligible for the death penalty under North Carolina law. (MAR, supra.) Had he been ineligible for the death penalty, the maximum punishment Petitioner would have faced was life imprisonment without parole whether he pled guilty or lost at trial.

Although the United States Supreme Court has held that the Eighth Amendment prohibits execution of the mentally retarded, see Atkins v. Virginia, 536 U.S. 304 (2002), it has not recognized a similar prohibition against execution of the mentally ill. Likewise, the North Carolina appellate courts have not held that the State's Constitution prohibits execution of the mentally ill. Thus, legal grounds for ineligibility for the death penalty must exist elsewhere for Petitioner to succeed on this claim.

Under North Carolina law, the decision whether to try a defendant capitally or non-capitally for first degree murder involving one or more aggravating circumstances is made by the prosecutor, not the trial court. N.C. Gen. Stat. § 15A–2004(a)-(b) (2009). Superior and District Court procedural rules require a pretrial conference in every case in which the defendant stands charged with a crime punishable by death. N.C. Super. Ct. & Dist. Ct. R. 24 (West). The purpose of the Rule 24 conference is, among other things, "to clarify the charges against the defendant and assist the prosecutor in determining whether any aggravating circumstances exist which justify seeking the death penalty." State v. DeFoe, 691 S.E.2d 1, 5 (N.C. 2010) abrogated on other grounds by statute (quoting State v. Chapman, 464 S.E.2d 661, 666 (N.C. 1995)) (internal quotation marks omitted).

15

The trial court conducting the Rule 24 conference may declare a case "non-capital" if the prosecution's "forecast of evidence at the Rule 24 conference does not show the existence of at least one aggravating circumstance." See Defoe, 691 S.E.2d at 6 (quoting State v. Seward, 657 S.E.2d at 358 (2008)) (internal quotation marks omitted). Petitioner does not contend that situation applies in his case.

A trial court also may declare a case noncapital, and a defendant shall not be eligible for the death penalty, if the defendant demonstrates by clear and convincing evidence at a hearing that he is mentally retarded. See N.C. Gen. Stat. § 15A-2005(c) (2014). The rules governing mentally retarded defendants and the death penalty state in pertinent part:

(a) (1) The following definitions apply in this section:

    a. Mentally retarded. -- Significantly subaverage general intellectual functioning, existing concurrently with significant limitations in adaptive functioning, both of which were manifested before the age of 18.

    b. Significant limitations in adaptive functioning. – Significant limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure skills and work skills.

    c. Significantly subaverage general intellectual functioning. -- An intelligence quotient of 70 or below.

(2) The defendant has the burden of proving significantly subaverage general intellectual functioning, significant limitations in adaptive functioning, and that mental retardation was manifested before the age of 18. An intelligence quotient of 70 or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist is evidence of significantly subaverage general intellectual functioning; however, it is not sufficient, without evidence of significant limitations in adaptive functioning and without evidence of manifestation before the age of 18, to establish that the defendant is mentally retarded.

(b) Notwithstanding any provision of law to the contrary, no defendant who is mentally retarded shall be sentenced to death.

§ 15A-2005(a)-(b) (2014). Petitioner does not claim here that he is mentally retarded or identify any of the criteria in the statute that apply to him. Nor did he raise such a claim in his MAR.

The state court reasonably could have determined that Petitioner failed to demonstrate that he was ineligible for the death penalty based upon his alleged mental illness. It also would have been reasonable for the state court to conclude that Petitioner would have insisted on going to trial only if he was ineligible for the death penalty. Thus, it would have been reasonable for the state court to reject Petitioner's claim on the grounds that he did not meet either prong of the two-part Strickland test. See §§ 2254(d)(1)-(2).

Petitioner also claims that counsel were ineffective for allowing him to plead guilty to two first-degree murder charges when they knew he was under the influence of an impairing substance and being treated for various mental disorders. (MAR, supra, at 5-6.) As demonstrated in the previous section of this Order, Petitioner failed to provide clear and convincing evidence to rebut the trial court's finding that he was competent to enter a plea on October 8, 2012, see § 2254(e)(1). See Section III C, supra, at 7-13. Because Petitioner was competent to enter his plea, the state court's rejection of this claim involved neither an unreasonable application of clearly established federal law nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See §§ 2254(d)(1)-(2).

### E. Remaining Claims

Petitioner alleges a violation of Brady v. Maryland, 373 U.S. 83 (1963) and a violation of his Fourth Amendment right against unlawful searches and seizures. (Pet. 7-8, Doc. No. 1.) The Brady claim is procedurally defaulted, and Petitioner has waived his Fourth Amendment claim.

In Brady, the Supreme Court held that a due process violation occurs when the prosecution suppresses evidence favorable to an accused that is material either to guilt or to

punishment, regardless of whether the prosecution acted in good faith. 373 U.S. at 87. A Brady violation implicates the 5th Amendment to the Constitution. See id. In his habeas petition, Petitioner refers the Court to paragraph five (5) of his MAR for the substance of this claim. (Pet., supra.) The claim raised in that paragraph is one of ineffective assistance of counsel, which implicates the 6th Amendment to the Constitution. There is no Brady claim raised anywhere in the MAR.

Absent a showing of cause and prejudice, or a fundamental miscarriage of justice, a habeas petitioner is procedurally barred from obtaining federal habeas review of a claim if he failed to raise and exhaust the claim in the state courts. See Coleman v. Thompson, 501 U.S. 722, 750 (1991); Wainwright v. Sykes, 433 U.S. 72, 84–85 (1977). To meet the exhaustion requirement, a petitioner must provide the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented through a habeas petition in federal court. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998). One manner in which procedural default occurs is when "a habeas petitioner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Id. (internal quotation marks omitted).

By failing to raise his Brady claim in his MAR, Petitioner failed to exhaust it in the state courts, and the court to which he would be required to present the claim in order to meet the exhaustion requirement would now find the claim procedurally barred. See N.C. Gen. Stat. § 15A-1419(a)(3). Petitioner has not demonstrated cause and prejudice or that a fundamental

18

miscarriage of justice would occur if the Court declines to consider the merits of this claim. Consequently, Petitioner's Brady claim is procedurally defaulted and will be dismissed.[3]

Petitioner also claims that law enforcement officers violated his Fourth Amendment right against illegal searches and seizures when they interviewed his six year-old biological son without his permission. Petitioner raised this claim in his MAR, and the state court rejected it on the merits.

"When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel" was incompetent. Tollett v. Henderson, 411 U.S. 258, 267 (1973); see also McMann v. Richardson, 397 U.S. 759, 766 (1970) ("[T]he plea is also a waiver of trial-and unless the applicable law otherwise provides, a waiver of the right to contest the admissibility of any evidence the State might have offered against the defendant[.]").

When Petitioner knowingly, intelligently, and voluntarily entered his guilty pleas, he waived his Fourth Amendment right to challenge the admissibility of the evidence gathered from his son. See Richardson, 397 U.S. at 766. Therefore, the state court's rejection of this claim was not the result of an unreasonable application of clearly established federal law. See § 2254(d)(1).

---

[3] Because Respondent did not raise exhaustion or procedural default as defenses to this claim, the Court has considered "whether justice requires that [Petitioner] be afforded with notice and a reasonable opportunity to present briefing and argument opposing dismissal." Yeatts v. Angelone, 166 F.3d 255, 262 (4th Cir. 1999). In this case, the default is obvious. Moreover, the allegations made in the claim are conclusory, contradictory, and do not identify any violation on the part of the State. Additionally, Petitioner did not assert in his MAR, nor does he do so here, that he is actually innocent of the crimes. Therefore, the Court has determined that justice does not require that petitioner be given notice and an opportunity to oppose dismissal. See id.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that:

1) Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 1) is **DENIED AND DISMISSED**;

2) Respondent's Motion for Summary Judgment (Doc. No. 6) is **GRANTED**;

3) Petitioner's motions for evidentiary hearing and for appointment of counsel (Doc. No. 3) is **DENIED**; and

4) Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 474, 484 (2000) (holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

**SO ORDERED.**

Signed: August 31, 2015

Frank D. Whitney
Chief United States District Judge